E-FILED
Monday, 29 July, 2013  05:24:27 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Linda Roos, Individually and as Administrator | ) | |
| of the Estate of Jack D. Roos, | ) | |
|     Plaintiff | ) | |
| | ) | |
|           v. | ) | Case No. 10-4073 |
| | ) | |
| Jason Patterson and Rock Island County, | ) | |
| by its Agency Rock Island County Sheriff's | ) | |
| Department, | ) | |
|     Defendants | ) | |

**ORDER and OPINION**

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me.  Now before the court are the defendants' motion for summary judgment (#30) and the plaintiff's motion to strike affidavits (#35). These motions are fully briefed, and I have carefully considered the matters contained therein. As stated herein, the motion to strike is DENIED, and the motion for summary judgment is GRANTED.

**I. JURISDICTION AND VENUE**

Linda Roos, individually and as Administrator of Jack Roos' estate, filed a seven-count complaint in the Circuit Court of Rock Island County, Illinois, on August 3, 2010. She asserted a claim under 42 USC 1983, alleging that Patterson had violated Jack's 4th Amendment right to be free from excessive force. In addition, she asserted state law claims against Patterson and the County under the Illinois Survival Act, (Counts II and III); a wrongful death claim against Patterson and the County (Counts IV and V); and a battery claim (Count VI) and an intentional infliction of emotional distress claim (Count VII) against Patterson.

1

On October 14, 2010, the defendants removed the case to this Court. The Notice of Removal asserted this Court's federal question jurisdiction, based on the claim brought under the Civil Rights Act of 1964, 42 USC 1983.

This Court has original jurisdiction over Count I, 28 USC 1331, and supplemental jurisdiction, 28 USC 1367, over the remaining claims.

Venue is proper in the Central District of Illinois, Rock Island Division, as the events leading up to this litigation occurred within this District, namely in Rock Island County, Illinois.

## II. MOTION TO STRIKE AFFIDAVITS

In support of its reply to the motion for summary judgment, Defendants submitted affidavits of Steven Bragg and Rusty Brown. Plaintiff has moved to strike these affidavits.

Rule 56 allows the submission of affidavits in support of parties' factual positions. FRCP 56(c)(1). Such affidavits must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify to the matters contained therein. FRCP 56(c)(4).

In Plaintiff's response to the motion for summary judgment, she relies in part on testimony from Paul Elliot. That testimony was not referenced in any way in the motion for summary judgment. The affidavits of Steven Bragg (#34-2) and Rusty Brown (#34-3) contain information that is designed to challenge certain facts testified to by Elliot.

In her motion, Plaintiff asserts that Elliot's testimony was known by all parties at the time the summary judgment motion was filed and that Defendant therefore should have addressed it in its motion rather than waiting until its reply.

Plaintiff's position is incorrect. Motions for summary judgment need not address all evidence, just the evidence that supports the position of the filer. If the opponent of the motion believes that there is additional evidence that is pertinent to the questions raised, it is incumbent on the opponent to direct the Court to that evidence; this is exactly what Plaintiff did in her response: she directed the court to additional evidence.

The purpose of a reply is to allow the original movant to address any such additional evidence that was raised in the response. This is precisely what Defendants have done. If, as asserted by Plaintiff, all the affidavits do is challenge the credibility of a witness, then that is a question properly addressed in ruling on the motion for summary judgment. It does not provide a basis for striking the affidavits. The motion to strike is therefore DENIED.

## III. SUMMARY JUDGMENT GENERALLY

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co, Ltd v Zenith Radio Corp*, 475 US 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. FRCP 54(c); see also *Jay v Internet Wagner Inc*, 233 F3d 1014, 1016 (7th Cir2000); *Cox v Acme Health Services*, 55 F3d 1304, 1308 (7th Cir 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. *Anderson v Liberty Lobby, Inc*, 477 US 242 (1986). The court's role in deciding the motion is not to

sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. *Waldridge v American Hoechst Corp*, 24 F3d 918, 922 (7th Cir 1994). The court has one task and one task only: to decide based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, *Erdman v City of Ft. Atkinson*, 84 F3d 960, 961 (7th Cir 1996); *Vukadinovich v Board of School Trustees*, 978 F2d 403, 408 (7th Cir 1992), cert denied 510 US 844 (1993); *Lohorn v Michal*, 913 F2d 327, 331 (7th Cir 1990); *DeValk Lincoln-Mercury, Inc. v Ford Motor Co*, 811 F2d 326, 329 (7th Cir 1987); *Bartman v Allis Chalmers Corp*, 799 F2d 311, 312 (7th Cir 1986), cert denied, 479 US 1092 (1987), and construing any doubts against the moving party. *Adickes v S. H. Kress & Co.*, 398 US 144 (1970);  *Trotter v Anderson*, 417 F2d 1191 (7th Cir 1969); *Haefling v United Parcel Service, Inc*, 169 F3d 494, 497 (7th Cir 1999).

The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. *Piscione v Ernst & Young, L.L.P.*, 171 F3d 527, 532 (7th Cir 1999). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v Village of Winnetka*, 371 F3d 992, 1001 (7th Cir 2004). The proper inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. See, e.g., *Jordan v Summers*, 205 F3d 337, 342 (7th Cir 2000).

A party opposing summary judgment cannot create a dispute of fact with an affidavit that contradicts what the affiant said in prior deposition testimony, at least

without some plausible explanation for the conflict. See *Bank of Illinois v Allied Signal Safety Restraint Systems*, 75 F3d 1162, 1168 (7th Cir 1996); *Hayes v Raytheon Co.,* 23 F3d 410 (7th Cir 1994); *Darnell v Target Stores,* 16 F.3d 174, 176-77 (7th Cir 1994); *Richardson v Bonds,* 860 F2d 1427, 1433 (7th Cir 1988); *Babrocky v Jewel Food Co. & Retail Meatcutters Union, Local 320,* 773 F2d 857, 861 (7th Cir 1985).

If the undisputed facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted. *Hedberg v Indiana Bell Tel. Co.*, 47 F3d 928, 931 (7th Cir 1995), citing *Anderson*, 477 US at 248.

If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party and on which that party will bear the burden of proof at trial, then summary judgment is proper. *Celotex*, 477 US at 322; *Waldridge*, 24 F3d at 920.

## IV. STATEMENT OF FACTS

Jason Patterson is a Sheriff's Deputy in the Rock Island County Sheriff's Department. On August 3, 2009, Patterson was dispatched to the home of Jack and Linda Roos in Table Grove, Illinois, regarding a domestic disturbance. When he arrived, he approached the front of the house. Linda Roos told him to go to the back of the house. In back, Patterson was able to observe that Jack Roos was holding a meat cleaver and was covered in blood. He could also see Linda Roos in the same room with Jack. Patterson yelled at Jack to put the knife down. He did not; instead he came out of the house, cleaver in hand. Patterson continued to tell Jack to drop the cleaver, but he did not. Patterson shot Roos once in the chest. Roos subsequently died.

This over-simplified version of the events masks numerous disputes of fact. The questions presented by the instant motion include questions about whether these factual disputes are material to the legal analysis. Hence, a more detailed recitation of facts, including explanations of the factual disputes, follows.

Before these tragic events, Jack Roos had lost his commercial driver's license as a result of a DUI. His unemployment led to depression. He had talked about suicide but to his wife's knowledge, had never made a suicide attempt. He had been prescribed an anti-depressant about a week before his death.

His wife, Linda Roos, testified that he was "really delusional" and severely depressed on August 1 and 2. For example, during those 2 days, he became "obsessed" with the Robert Young Mental Health Center, believing that "they" were coming to get him. The Roos's lived next door to County Deputy Sheriff Frank Weikert, who parked his marked squad car in his driveway, and Jack also was convinced that Weikert was "coming to take him." He was certain that Weikert was sitting in his squad car waiting for him, although Weikert was not in his car at the time.

On the morning of August 3, Linda observed the same delusions about the Robert Young Mental health Center. After her shower, she went into the kitchen. There she saw Jack holding a meat cleaver; he had cut himself across the neck and was covered with blood. She first attempted to hold her hand or a towel to the wound, but Jack pushed her away. She then grabbed a telephone a dialed "911." While she understandably does not recall specifically any details about that call, the call was recorded, and the recording has been placed into the record. During the call, Linda is heard to make each of the following statements:

6

"I can't let you do this."

"Please, Jack, don't."

"Please put it down."

"Please don't do this."

"Don't do this in front of me."

"Please get somebody here."

In addition, the voice of the dispatcher is heard, saying to the responding officers that it "doesn't sound physical at this time." During the call, another call came into the 911 center. While the dispatcher was attempting to handle both calls, Officer Jason Patterson arrived at the Roos house. He went to the front door and knocked several times; he heard a voice tell him to come to the back. The parties nitpick about whether Patterson walked, ran or jogged to the back of the house, but his pace is wholly immaterial to the pertinent issues. Whatever pace it was, Patterson proceeded through the side yard and around toward the back of the house. On the back of the house is a deck that is accessible by a single set of about 4 stairs; a door into the kitchen is accessed from the deck. Patterson went up the stairs and looked into the house through that door.

At some point between the front yard and the deck door, Patterson drew his weapon. There is a dispute of fact about whether he had his gun drawn while he was still in the front yard or whether he drew it later. Patterson testified that he did not have his gun drawn as he approached the deck but rather pulled his gun when he was able to look into the patio window. Linda Roos testified that he had his gun drawn when he came to the back where she could see him, which is not necessarily inconsistent with Patterson's description.

Amanda Weikert lives next door to the Roos house. She was in the living room and observed some of these events through a window. She saw Patterson arrive, go to the front door and then run to the back of the house. When he got to the back of the house, she could see that Patterson "had his gun drawn but could not see what he was pointing it at." (Exh. G, Doc. 30-7).

Amanda's sister Kayla Weikert was also able to observe some of the events. She thought at first that Patterson was looking for her father, who is also a police officer. She went outside to talk to Patterson but then saw the squad car pull into the Roos' driveway. She observed Patterson go to the front door and then run to the back of the house. She stated that he had his gun drawn at that time, but it was "down low," by which she meant "not aimed." A careful reading of her affidavit makes it unclear whether she meant Patterson's gun was drawn at the front door or in the back.

I find that this dispute is immaterial. All parties and witnesses agree that Patterson had drawn his weapon before Jack came out of the back door. Whether he was in the front yard or on the deck when his weapon was first drawn has no bearing on any of the subsequent facts or on any legal questions presented in this motion.

Looking into the house from the deck, Patterson was able to see into the kitchen where he observed a man covered in blood holding a meat cleaver. There was also a woman in the kitchen that also had blood on her. Even though Patterson had been told by the dispatcher that it didn't appear as though anything physical was involved, it appeared to Patterson as though there was some type of confrontation going on between the two. He described this confrontation as "close," the man's hands were "kinda" on the woman but "nobody's hitting each other or nothing like that." He saw a lot of blood on the

8

cleaver and on the man and could tell that the man was bleeding. He could hear that the two were talking but not screaming. In fact, he stated that the confrontation "wasn't as heated as you would think" given the amount of blood. He knew the man was hurt but did not know how the injury had occurred.

Patterson immediately began commanding the man to "drop it" or "put it down." The man with the cleaver – Jack Roos – did not obey those commands. Instead he began coming toward the back door, meat cleaver in hand. There is a dispute about whether he was holding the cleaver to his neck or in the air, but this dispute, too, is immaterial to the legal issues presented here. What Patterson saw, everyone agrees, was a man covered in blood holding a cleaver and heading towards the back door, where Patterson was standing.

Patterson retreated away from the door and down from the deck. Whether he backed down the stairs, as Linda recalls, or jumped off the deck, as Patterson recalls, is immaterial. Patterson recalls that Jack kept coming – across the deck and down the stairs into the grass of the back yard, where Patterson was standing by then. Both Patterson and Linda continued to tell Jack to drop the cleaver, but he did not do so.  Patterson testified that, after he was off the deck, Jack continued to advance towards him with the cleaver in the air, like "he was on a mission." Patterson felt as though Jack was going to attack him. When Jack was about 5-10 feet away from Patterson, still ignoring commands Patterson's commands to drop the cleaver, Patterson shot him once in the chest.

Jack fell to the ground, dropping the cleaver, and Patterson radioed that shots had been fired.  Jack was still moving around.   It appeared to Patterson he was trying to reach the cleaver. Linda, too, appeared to be trying to grab the cleaver. Patterson kicked the

cleaver out of their reach and told Linda, who was understandably agitated, to back up and get away from Jack[1]. A neighbor, who told Patterson she was an EMT, tried to help Jack but he grabbed her and would not let her help him.   Other officers arrived quickly, as did the ambulance. One of the officers had to force Jack to release the neighbor, and Jack continued to struggle with paramedics who were trying to treat him.

Linda, who was in her pajamas while the situation evolved, had gone back into the house, where she was changing clothes so she could go to the hospital with Jack. One of the officers went in to get her out of the house and away from the scene. At the hospital, Jack died.

From the time Patterson radioed to dispatch that he had arrived at the scene of the domestic dispute to the time that he is heard on the 911 recording saying "shots fired," less than 2 minutes had elapsed. The dispatch tape shows that less than 30 seconds elapsed from the time Patterson arrived at the back door until the shot was fired.

Linda, who had followed Jack out onto the deck and down the stairs, made a number of statements immediately following these events. For example, soon after the shooting, other officers arrived at the scene. One of them, Deputy Donald Jon DeLoose, spoke with Linda, who told him that "the officer had no choice, he wanted to die." She also said to her neighbor Frank Weikert (who is a retired Deputy) that "Jack's so stupid. I tried to stop him. The officer didn't have no choice." In fact, she repeated to Weikert, "he just wouldn't stop" several times during that time.

---

[1] Linda also states that Patterson kicked her leg when they were struggling for the cleaver. This fact is wholly immaterial.

In the police department's investigation into this incident, Linda was interviewed twice by Detective Leo Hoogerwerf on August 3, 2009, the date of the shooting.[2]  The first interview was verbal and is memorialized in the Detective's Affidavit. Therein, the detective relates that Linda told him that Jack ignored Patterson's commands to put down the cleaver, and instead "continued to advance towards the Deputy with the cleaver in his right hand held up high." Linda stated that Patterson shot Jack when Jack was about 10 feet from Patterson.

After she made her verbal statements to Detective Hoogerwerf, Linda consented to a recorded interview with him. In that interview, she confirmed that when Patterson arrived, Jack was "holding up" the knife "like a cleaver" and "going towards the Deputy with it and that's when the Deputy shot him." On further questioning, she stated that she and Patterson "were trying to get him to drop [the cleaver] but then he, he kept going towards him."

Linda testified differently at her deposition, when she stated that Jack was at all times holding the cleaver to his neck, rather than up in the air. She also testified that, after he came out of the house and went across the deck, he went down the stairs and proceeded to his left into the back yard; he was not approaching Patterson but rather was proceeding parallel to the direction Patterson was walking. Linda testified that Jack never advanced towards Patterson once they were off the deck. At some point, Jack stopped moving, and Linda testified that it was then that Patterson shot Jack.

 Linda's explanation for these contradictions is that, when she initially said Jack was "going towards" Patterson or "advancing" on him, she was only talking about when

---

[2] At one point in her response, Plaintiff asserts that these statements were "coerced" from her. There is absolutely nothing in the record that would support such an assertion, and the Court simply ignores that characterization of the statements.

the two were both on the deck. She also complains that her statements must be considered in the context they were made: she had been through a "horrible ordeal" shortly before making those statements.

Other witnesses testified consistently with Patterson and with Linda's original statements. Amanda Weikert stated that, within seconds after she saw Patterson go to the back yard, she saw Jack "running from behind his residence towards the Deputy." She could see Jack's profile and see that the Deputy was "yelling and backing up." Kayla Weikert also stated in her affidavit that she saw Jack "come from the back of the residence, running directly at the Deputy." Patterson was, she said, "backing up away from Jack Roos," and she saw Jack "continue to advance on the Deputy." When Jack was "a few strides" from Patterson, she saw Patterson stop and shoot Jack.

After the incident, Patterson was placed on administrative leave. For 2 weeks, he was off work entirely, and then he returned to light duty for several more weeks. During his leave, he was relieved of his uniform, badge and gun. He returned to full duty in mid-September.

**V. DISCUSSION**

In the summary judgment motion Deputy Patterson raises qualified immunity, asserting that under clearly established law, his conduct was objectively reasonable. He also argues that because his conduct was reasonable, Illinois law prohibits a finding that he acted willfully and wantonly. Finally, the County and the Sheriff posit that their liability hinges totally on a finding that Patterson is liable; because he is not, they cannot be. Each of these assertions is discussed separately below.

Qualified immunity shields a police officer from liability for civil damages if "a reasonable officer, facing the same situation, could have believed that deadly force was necessary to protect himself or others from death or serious physical harm." *Ellis v Wynalda,* 999 F2d 243, 246 (7th Cir 1993). It "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v Bryant,* 502 US 224, 229 (1991) (quotation marks omitted); *see also Pearson v Callahan*, 555 US 223 (2009) ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." (Quotation marks omitted)).

When examining a qualified immunity claim, a court examines whether a constitutional right has been violated; and then, if so, whether the right in question was sufficiently well established that a reasonable officer would have been aware of it. *Saucier v Katz*, 533 US 194, 200 (2001). The two portions of the qualified immunity analysis may be addressed in any order, so that the discussion is framed in the way that produces the clearest decision. *Pearson*, 555 US at 241.

A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and must therefore be objectively reasonable. *Muhammed v City of Chicago*, 316 F3d 680, 683 (7th Cir 2002), citing *Tennessee v Gardner*, 471 US 1, 11-12 (1985).  Use of deadly force is objectively reasonable if the officer had probable cause to believe that an armed suspect "poses a threat of serious physical harm, either to the officer or to others." *Id.* at 11–12; see also *Bell v Irwin*, 321 F3d 637, 639 (7th Cir 2003). If a suspect threatens an officer with a weapon, the use of deadly force is reasonable. *Id;*

*DeLuna*, 447 F3d 1008, 10110 (7th Cir 2006); *Sherrod v Berry,* 856 F2d 802,  804–05 (7th Cir 1988)(*en banc)*; *Ford v Childers*, 855 F2d 1271 (7th Cir 1988)(*en banc*).

An officer's determination of the appropriate level of force to use must be measured from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v Connor,* 490 US 386, 396 (1989); *Bell*, 321 F3d at 639. What is important is the amount and quality of the information known to the officer at the time he fired the weapon when determining whether the officer used an appropriate level of force. *Sherrod* 856 F2d at 804–05.  Thus, "when an officer believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Id.* at 805 (emphasis omitted).

Allowance is made for the fact that "police officers are often forced to make split-second judgment - in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham* , 490 US at 396.  The question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id* at 397.

Reasonableness is not based on hindsight, *DeLuna*, 447 at 1010, and the question is not whether another reasonable interpretation of the events can be constructed after the fact. *Malley v Briggs*, 475 US 335, 341 (1986).

Courts within the Seventh Circuit have regularly granted and affirmed summary judgment on excessive force claims where the suspect threatened an officer with a weapon or where the officer reasonably believed that the suspect had a weapon. See, for

example, *Plakas v Drinski*, 19 F3d 1143 (7th Cir 1994); *White v Ficaro*, 2001 WL 109813 (ND Ill); *Howard v City of Freeport*, 2010 WL 5175083 (ND Ill); *Cooper v City of Rockford*, 2010 WL 3034181 (ND Ill). Whether the officer was ultimately correct is irrelevant so long as the officer reasonably believed it was so. *Sherrod*, 856 F2d at 807. As the Seventh Circuit said in *Plakas*, "Shooting a man who has told you, in effect, that he is going to use deadly force against you and then moves toward you as if to do so is unquestionably an act of self-defense even if … the man is attempting 'suicide by police." 19 F3d at 1146.

 Plaintiff argues that there are material disputed facts about whether Jack threatened Patterson with the cleaver, and that from these facts, if taken in the light most favorable to the Plaintiff, Patterson knew or should have known  that Jack was a danger only to himself.

With respect to the first argument, there are three fatal flaws. First, even if Patterson was mistaken in his assessment of the situation, his mistake was not unreasonable given the totality of the circumstances. He had only a few seconds from the time Jack came out of the door wielding the cleaver and running at him to decide on a course of action. For him to have concluded that Jack was a risk to his safety was not an unreasonable conclusion.

Second, the relevant inquiry is not how the scene appeared to Linda; it is Patterson's perception that is important. Patterson viewed Jack as a direct and immediate threat. The events were rapidly evolving, and it was necessary for him to make an immediate decision whether Jack was a threat. There is nothing unreasonable, given the

totality of the circumstances, about Patterson's conclusion that he was in danger and that deadly force was necessary. Linda's perception of events is not pertinent to the equation.

Third, the asserted "dispute" comes only from the Plaintiff's recantation of all of her own contemporaneous statements. If it were not for her recantation, these facts would be undisputed: other than her deposition, Patterson and the eyewitnesses are unanimous that Jack advanced on Patterson with the cleaver held high, as a weapon.[3] If Linda had given just a single statement that she later contradicted, perhaps the Court would be inclined to view the later contradiction with more lenience. If the evidence in the record from other sources supported her after-the-fact testimony, perhaps the Court would be inclined to find the existence of a factual dispute.  But Linda gave at least 4 separate statements to 3 different people, all of which were consistent with each other and with the other witnesses' testimony and all of which were made immediately after the underlying events.

Linda's prior statements contained very clear, unambiguous facts – that Jack "was going towards the Deputy with it and that's when the Deputy shot him" and that Jack was holding the cleaver "in an upwards direction…like a cleaver". Under the circumstances here, she cannot create a genuine dispute about those facts by contradicting herself as to those very facts. See, *Bank of Illinois v Allied Signal Safety Restraint Systems*, 75 F3d 1162, 1168 (7th Cir 1996); *Darnell v Target Stores,* 16 F3d 174, 176-77 (7th Cir 1994); *Richardson v Bonds,* 860 F2d 1427, 1433 (7th Cir 1988); *Babrocky v Jewel Food Co. & Retail Meatcutters Union, Local 320,* 773 F2d 857, 861 (7th Cir 1985).

---

[3] Linda's assertion that her statements are inadmissible hearsay is incorrect. These statements come in as exceptions to the hearsay rule under FRE 803(1) and/or (2).

Moreover, her effort to explain the contradiction - that she meant Jack was "advancing" on Patterson only when they were both on the deck and not when they were in the yard – makes no sense given what she originally said, namely that "he wouldn't stop" and that Jack was "going towards the Deputy with it and that's when the Deputy shot him."

Finally, even if the Court were to give some credence to Linda's deposition testimony - that Jack had stopped advancing on Patterson by the time Patterson discharged his weapon - the fact remains that Jack was wielding a very large knife and was failing to heed orders to drop it. He had already injured himself and possibly Linda. He was trying to get away from Patterson in a residential neighborhood where Patterson was aware of at least two young women who were outside in the immediate vicinity. A decision to stop Patterson by means of deadly force would still have been a reasonable decision.

One more factual issue should be addressed as it relates to the Civil Rights Act claim. Plaintiff argues that Patterson should have known that Jack was suicidal – and hence apparently not intent on harming Patterson. That question is irrelevant: even a suicidal person can be a threat to others, like Linda and Patterson, who attempt to intervene. See, *Plakas*, 19 F3d 1143; and *Estate of Escobedo v. Martin*, 702 F3d 388 (7th Cir 2012).

Patterson, moreover, was not obligated to correctly assess Jack's intent. "It is not necessary that the danger which gave rise to the belief actually existed; it is sufficient that the person resorting to self-defense at the time involved reasonably believed in such a

danger." *Taylor v City of Chicago*, 2003 WL 22282386 (ND Ill), quoting *Sherrod*, 856 F2d at 805-806.

Most importantly, however, is the fact that this assertion - that Patterson should have known about Jack's state of mind - is not supported by the record. The two facts on which Plaintiff relies are the dispatcher's information that the situation did not appear physical and the statements Linda made to Jack that were recorded on the 911 call. Neither of these facts goes to Patterson's perception of the events as they unfolded.

First, even though Patterson had initially been informed by the dispatcher that the situation did not appear physical, that information was directly and immediately discredited by what Jack saw when he looked in the window – a bloody man holding a cleaver in close contact with a woman who also had blood on her. Clearly that situation was physical.

Second, Linda's pleas to Jack that appear in the transcript of the 911 call are statements that the dispatcher heard Linda say to Jack while they were still in the kitchen; those statements were not heard by Patterson, who was outside. In the few seconds Patterson had to make his decision on how to act, nothing that he heard or saw would have immediately told him that Jack was suicidal rather than homicidal.

One final matter must be discussed: the affidavits about which Plaintiff complained in her motion to strike.  In Plaintiff's response to the motion for summary judgment, she offered the affidavit of one Paul Elliott to rebut Patterson's testimony that he felt his life was in danger, that his use of deadly force was to protect his own life, and that he had never felt more threatened at any time during his career.

In his affidavit, Elliott relates that in August 2009, he was working as a clerk at a gas station. On one evening during that month, he was working with Rusty Brown. On that evening, a man he identified as a police-officer-friend of Rusty Brown came into the station and engaged in conversation with Brown.  Elliott did not know the man personally and he was unable to recall exactly how he ascertained that the man was Deputy Patterson, but in his deposition he testified that he thought it was probably due to the fact that the man was wearing a police uniform, a badge, and a name tag. In his affidavit, Elliott recounts overhearing a conversation between these two men in which the uniformed police officer said that he had not felt threatened by Jack, that he had been angry with Jack because he "was trying to take control of the situation" and that he was upset that Roos was not following his commands.

Defendant has tendered two affidavits to counter Elliott's testimony. Steven Bragg, the owner of the gas station, affirmed that Paul Elliott was fired just prior to August 21, 2009.  The affidavit of Rusty Brown, the person identified by Elliott as having been conversing with Patterson, states that he has never spoken to Patterson about the shooting. He recalls only one conversation with Patterson after the shooting, a conversation that took place in September of 2009 (after Elliott was fired). That conversation took place at Rusty's auto body shop, and the shooting was not discussed therein.

It is true that this Court cannot resolve credibility issues in ruling on a motion for summary judgment. Even if one assumes, however, that Patterson did in fact make such a statement, there are all kinds of explanations for it. It was not a contemporaneous statement and may well have been just bluster or braggadocio.

19

Moreover, the Court is concerned that Elliott's testimony has been tendered for consideration at all. Based on the record in the case, the conversation about which Elliott testified must have taken place between August 3, 2009 (the date of the shooting) and August 21, 2009 (the date Elliott was fired from his gas station job). But the record also establishes that, immediately after the shooting, Patterson was placed on administrative leave; he was relieved of his gun, uniform and badge until mid-September. Either the conversation did not take place *when* Elliott testified that it did (because Patterson would not have been in uniform during that time) or *where* Elliott testified that it did (because Elliott was no longer employed by mid-September when Patterson began wearing a uniform and badge again). Because Elliott has presented no facts that would support personal knowledge of a conversation anywhere other than the gas station, his testimony cannot be interpreted as being wrong about the place of the conversation. But if the conversation occurred in the gas station, then the police officer involved in the conversation could not have been Patterson.

I decline to consider Elliott's affidavit and deposition testimony. This is not a credibility determination at all. It is a conclusion, based on the record, that it was literally impossible for the conversation about which Elliott testified to have occurred. The evidence is worthless.

There is no genuine dispute of any material fact that calls into question the reasonableness of Patterson's decision to use deadly force. There was, therefore, no constitutional violation, and Plaintiff's claim under the Civil Rights Act fails. There being no violation of the Fourth Amendment, Patterson is entitled to immunity on this claim.

Because I have concluded that Patterson's conduct was reasonable under the Fourth Amendment, his conduct cannot be deemed "willful and wanton" under Illinois law. *LeLuna* at 1013; *Muhammed* at 683; *White* at 813-14. Plaintiff's *respondeat superior* and indemnification claims against the County and the Sheriff are wholly dependent on the success of her claims against Patterson. 745 ILCS 10/2-109; see also *Taylor,* 2003 WL 22282386 at *18. Because the claims against Patterson fail, these claims fail as well.

## VI. CONCLUSION

For the reasons stated herein, Plaintiff's motion to strike affidavits [#35] is DENIED and Defendant's motion for summary judgment [#30] is GRANTED. The Clerk is directed to enter judgment in favor of the Defendants Jason Patterson, Rock Island County, and Rock Island County Sheriff and against the Plaintiff. This case is terminated.

ENTERED: July 26, 2013

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE